Mike Pruitt appearing on behalf of the appellants. I'm happy to give the department as much time as they would like. I was thinking about giving them at least half the time. Would you like to hear from them first? Your call. I think we know what the appellant's position is. It was well articulated in the Delgado case. I'd be interested to hear what the department has to say. I will defer to counsel for the department. It's all right. I know. Thank you, Your Honor. As long as you don't expect me to present the facts for Mr. Christopher, I'd like to just go straight to the appellant's position. But I do wish to hear from the appellant as well, so please don't waste too much time. Counsel, what are we to make of the fact that the Department of Labor allegedly has never really addressed this issue in the way that it did in the amicus brief for, what is it, 60 years or whatever time the regulations have been in effect? Well, Your Honor, with all due respect, that's just entirely untrue. Our regulations creating a distinction or explicating the distinction between sales work, which is performed by an outside salesman for the purpose of the exemption, and promotion work, which may also be performed by that same person, but which is not exempt by application of our regulations. It's essentially been in place since approximately 1940. We have reaffirmed the distinction between promotion duties and sales duties and clarified when the exemption should apply and when it should not apply. In 1949, in 1965, in 2004, when we revised the Section 541 regulations, there are quotations in our preamble. Detail has been around since the 1940s at least. Has the department ever brought an enforcement action to declare that they're entitled to a time and a half or overtime until 2009? Your Honor, I've only worked for the department for approximately three years, so I really can't give you a great history. I think the answer is no. And so the question is, what caused Van Winkle to wake up from this 70-year sleep? Well, if I could just address, just following up on the question about the preamble, in 2004, we did engage in notice and comment rulemaking, and this was one of the issues that was put out for notice and comment, the outside sales exemption in particular. And there are some comments, and I'm not aware of any pharmaceutical industry comments in particular, but if you take a look at the Novartis decision, the Second Circuit had a summary of comments that were filed by the Grocery Manufacturers Association and the Chamber of Commerce. And I would note that the Chamber of Commerce also filed an amicus brief in the Second Circuit in the Novartis case. And the Second Circuit quoted what we said in our preamble in 2004, pretty much word for word, that they asked us to abandon the primary duty test and to include all promotional work, whether or not connected to the employee's own sales. And we found, again, not specific to pharmaceutical representatives, but in many, many other contexts, in many other industries, we have recruiters, military recruiters, organ donor recruiters, people who do advertising and marketing, manufacturers' representatives, is the term that's used in the regulations in Section 503. We said, essentially, when it's a manufacturers' representative who's stimulating sales to be made by someone else, that work is not exempt. And the reason is because that person is under the control of the manufacturer, they're normally working an eight-hour day, they can be paid overtime. Very, very different from the jewel tea situation where the person is going door to door, outside regular hours, outside the control of the manufacturer. And if you have a person who is doing both sales and promotion, we have a set of regulations where we evaluate whether or not they fall on one side of the line or the other. We always say you can do promotion, and it may be exempt if it's directed towards your own sales. The consummation of your own sales. What do you mean your own sales? Well, we have an example, Your Honor, in Section Part 541.503. We have a manufacturers' representative who comes to the store and who says, I think you should rearrange your shelving, put up some posters, you know, I think we can do better on selling this particular item, handing out free samples, they might do a number of things. But they're not making the sale. They say, call my office, order some more whatever. That's different from the situation where you have the manufacturers' representative who has the order pad, who can come to the store and who can say, I think you should buy more of these things. Which is this closer to? You see, I can understand in the automobile industry, if Ford sends out people from Detroit and says to go to all the dealers and say, if you display it this way and change your advertising a little bit and do this and here's our new models that are coming and this is how you should sell them. He's not selling. He's doing promotion. But that's because there you have someone who's actually selling and he's promoting the product to the people who are doing the actual selling. That's not really what we have here. We have many, many different fact patterns and we have addressed these issues many times throughout the years. We have the military recruiter case that was in the Tenth Circuit, which is another example of somebody who goes out door-to-door, they're interacting with people, they're trying to stimulate people to join the Army, but they don't have authority to sign anyone up. We have a door-to-door salesman case that's quoted in our 2004 preamble, we quote back to this 1965 case. Are those cases enforcement actions or did the department intervene as amici or file amicus briefs? I'm still trying to get an answer to my question as to what caused the department to suddenly start going after the pharmaceutical companies. I don't think it's fair to say that we've gone after them. I think it is fair to say that we filed an amicus brief in the Novartis case and the Second Circuit granted deference to our amicus brief in that case. We filed amicus briefs in many, many cases. I just wanted to mention in response to Your Honor's question, ours was itself a case where the Supreme Court gave deference to an amicus brief. We've had the Long Island Care v. Coke case where we filed, again, we had regulations. The regulations were challenged. The Supreme Court gave us deference because we were interpreting a section of the law that Congress gave us express delegation of authority to interpret. Other than your amicus briefs, though, has the department promulgated any new regulations or issued any advisories or opinions or anything dealing specifically with the pharmaceutical industry? Not that I'm aware of in the pharmaceuticals, Your Honor. We've dealt with mortgage brokers. We've dealt with insurance salesmen. We've dealt with door-to-door salesmen. The opinion letters that are cited in the brief, one has to do with people who recruit organ donors, again, where sale would be prohibited by law, similar to this case. So basically, from your perspective, the department really doesn't have to do that. The regulations have been around a long time. You respond to things as they come up. This one came up. You have now responded. Yes, Your Honor. Does the department agree that the regulations are somewhat ambiguous from time to time? Well, Your Honor, I think that if you look at the group, Part 541.500 through 504, we have tried to make as much clarity in there as we can, and we provided examples. For example, we say make in sales, generally speaking, we define as the exchange of a tangible or an intangible exchange. I don't have the actual wording, but we have that regulation. Then we go on to say taking orders. We do consider taking orders to be a sale. I would not agree with my colleague that a person who fulfills a prescription at the pharmacy is taking an order in any way from the PSR. I mean, that's one of the problems here is that they're not allowed to take orders. If they were taking orders, clearly they'd be making sales under our regulation. But I just want to clarify one other – But they can't do that because the FDA says that that violates medical ethics, right? They can't – Absolutely. They won't allow the detail men to actually take – to book an order. The best they can do is try and get an oral promise, which is not even binding on the doctor, that he'll prescribe more. Exactly, Your Honor. And an oral promise under our regulations, unless it's something that is going to be a binding commitment, there's some kind of consummation, there's some kind of transaction that takes place. Again, you go back to the statutory language. A sale is an exchange. It can be a sale of goods for money. It can be a consignment for sale. It has to be a disposition. It has to be some kind of legal transfer of property for money. It's property of some kind. Is there any kind of – I think one of the predecessor counsels suggested there was kind of a surprise element here. These regulations have been around for a long time. The pharmaceutical industry has carried out its business in this way for a very long time without any requirement to pay overtime and the like. Does the department or does this court – are we supposed to take that into account, and if so, in what way? Well, Your Honor, again, I have to say that these regulations have been in place since approximately 1940. We did revise them in 2004, and we stated in the preamble to that regulation, which certainly the pharmaceutical industry was free to comment on. I'm not aware whether they actually did comment. But the Grocery Manufacturers Association and the Chamber of Commerce, as I said, they wanted us to essentially abandon the primary duty test because they said it's not flexible enough. And what we responded was you have to look at what we have said, in particular in Section 503 and in Section 504, which deals with driver salesmen. We have a number of criteria that we look to, and what we're always looking for is whether the primary duty is sales. If the primary duty is sales, you know, they can also do related duties. Does that make sense here? Does that really make sense here? To say the primary duty is sales or something else maybe to distinguish, but there are no salesmen in the traditional way here. So I guess what I would like to hear from the Department of Labor is why is your literal interpretation of this rule, which I can understand, you know, in the English language, your interpretation. And I understand your argument that you're entitled to deference, but what I'd like to know is why is it correct? Why is it really appropriate in the big picture? Well, Your Honor, I think if you review the regs, in particular 503, Section 541.503, you will find that these people are promotion people. Promotion men is a term that we've used for the last 70 years. And in many, many countries, probably. Well, but that's language. Yes. That's language. So what is why, the reason that you say that they are promoters, other than the fact that they're not making sales because they can't. That is the key. That's it. That's the primary duty. So, again, we may have more promotion men in the pharmaceutical industry. Are they the functional equivalent in this industry of salesmen? No, Your Honor, for all the reasons that I've said. If you look at our regulation, you walk through what it says, they must be obtaining a binding commitment. Their actions must lead towards the consummation of their own sales. And, again, we have no problem with them stimulating sales by someone else, but we think that the manufacturer should pay overtime to them. Okay. I understand. That's the net result. I hear you. Okay. Let's hear from the appellate. Oh, can I just say one word about the administrative exemption, Your Honor? Okay. We've stated in our brief that we believe that they're also not exempt under the administrative exemption. I'll be happy to answer questions if you have any about why. Okay. Thank you. I'd like to start with an argument or an issue that Ortho's counsel brought up that I anticipate the GSK's counsel will discuss as well, and that is the Section 779.241 argument. Their argument is that that regulation, which broadly defines selling, was not considered by the DOL and should be. Our position on that is that it's in a different area of the regulations. It's in the coverage side, which has a broad construction. The purpose of the FLSA is to be construed broadly. What GSK is promoting to do is to take that regulation and transport it into Section 541, which is to have a narrow construction, and it's not appropriate to do that. And there's no cases that they've cited that I've seen that supports that proposition. The same argument was made 41 years ago before the Fifth Circuit in Wurtz, and they handily turned that down essentially on the argument that you can't transport a regulation that is designed to talk about coverage and has broad language and constrained coverage and then use it in 541 exemption. I understand the court's concern about what the PSRs look like. It's kind of like they sound like a duck or quacks like a duck. Are they the functional equivalent of salespeople in this industry because of the regulations? No, they are not the functional equivalent. There are salespeople in this industry, and as the counsel in Delgado indicated, the sale occurs from the factory to the wholesalers to the pharmacists. You have this other side that increases demand, and it's not limited to the PSRs. We can't watch an hour worth of TV without seeing two or three advertisements. Sadly. They have doctors who write articles in trade publications. They have mailers. It's a strategy from A to Z, and the reps are one part of that strategy. None of them, though, and the courts that have struggled with this, have had to kind of back-fit this industry into the FLSA, and I think the Second Circuit got it right when they said, if this industry wants to change the law, there's a way of doing it, not through the courts, but through Congress. Judge Smith, you had mentioned some questions on deference. There is a Ninth Circuit case that I believe used the same hour of discretion. It's a disability center, and it's a 2009 decision, and I think in there they relied on an amicus brief filed in the Second Circuit, in fact. So from our position, the starting point is not the indicia of sales. It is whether they make sales, and clearly they do not make sales, unless the court has any other questions. I just want to know, I'm still trying to figure out who the real salesman is here. Is it the order taker, and does the order taker get a bonus when they book the order? Do they get incentive compensation? Your Honor, frankly, in the Christopher case, the record is a little thin on that side of the transaction. What is clear is that the PSRs do not engage in that activity. But you insist that the industry has salesmen, and I'm trying to figure out if it's not the detail, then where is the salesman? Well, honestly, I don't know whether they have on the production side that gets it to the wholesalers, that gets it to the pharmacies, whether they have outside salespeople that go about it. They're apparently not outside. Or whether they're inside. But clearly the PSRs do not fit that function. None of them are involved in getting the product from the factory over to the wholesalers, to the pharmacies. But unless there is, following up on Judge Thomas' question, then in effect what you're saying is that there are no salespeople in the industry. The sales generate magically. Somewhat, no. There isn't a magical sale. Money changes hands somehow. There is a contract that is entered into with wholesalers. Money changes hands. The wholesalers then have contracts with the pharmacies, and a profit is made. And then that number is driven by demand. And the demand, in part, is created by the PSRs. But there's other reasons. They spend billions of dollars in advertising. And it can't be solely linked to what the PSRs. And as the court has pointed out, we can't link up a specific doctor's prescription with a PSR. We just can't do it. If that's the case, then why does the industry pay the PSR a salary plus incentive? Why don't they just put them on a straight hourly rate, which at $60,000 or $100,000 a year would be a pretty significant hourly rate, and then pay them time and a half? They could. Ideally, in the GSK case, it's 25%. The reality is that it varies. And one of the reasons I think they keep it on a limited basis is probably because of the FDA regulations. But that's something that perhaps they can argue as to why they don't make it entirely commission-based. Well, I'm just trying to figure out from an economic reality standpoint, it seems to me if you're trying to stimulate sales, incentives, commissions, bonuses are the way that you do it. And you don't do it by paying somebody a straight hourly rate and then pay them a time and a half for sitting at home and doing sales reports after they've made their calls. I understand that. But the way the industry works is that it's not necessarily completely directed to the volume of prescriptions filled in a particular territory. It may be based on market share. And in that case, you could actually have a reduction in sales at the pharmacy as long as your market share was higher than someone else's market share. So it's a formula. And it's not specifically driven by volume of sales. Okay. Perhaps on this we'd be good to close there because you're way over time. And I think your adversary may be able to respond to these points as well. Thank you. Good morning, Your Honors. My name is Neil Mullen. I'm here for GSK. And I'd like to start this morning with the plaintiff's brief, the plaintiff's principle brief, in which they make the following concession. Plaintiffs here have agreed that they sold GSK products in the sense that they tried to urge doctors to prescribe a product so that the product would ultimately be purchased in greater volume. I'd like to focus the court on the phrase, in this sense. That's a very meaningful phrase in this area of the law. Since 1940, the Department of Labor has told employers that all that need happen for someone to qualify for this exemption is that they engage in sales in some sense. They've repeated it many times, most recently in the 2004 preamble. And when they did, Your Honors, they put it in italics. They were emphasizing in some sense. Not in every sense. Not in a prototypical sense. Not in a technical sense. In some sense. Let's look at the facts of this case through that lens. These people were hired because they had sales backgrounds. They're trained in sales techniques. They visit physicians and try to discern their objections to using GSK products. They try to overcome them by using techniques that are common to salespeople. And then they attempt to get a commitment to prescribe from the physician. Not just in some sense. In nearly every sense, what these individuals do is the work of a sales rep. Now, what's happened in this case is that the Department of Labor and the plaintiffs have attempted to essentially wipe away 70 years of uniform, consistent guidance to employers that the exemption applies where the individual engages in sales in some sense. And to substitute for that standard, a new standard articulated for the first time in this brief, that the individual not only must be engaged in sales in some sense, he must engage in the following sense. There must be a fully consummated transaction. That is irrevocable. It must be consummated personally by the individual for whom the exemption is sought to be applied. And it must involve the actual transfer of goods for a price. That's entirely new law. It is entirely inconsistent with what the agency has said for 70 years. And to Your Honor's question about our deference, I think it undermines any claim that the agency is entitled to any deference. Now, in our, the court recited the grounds on which our deference would be appropriate. They started with the standard that it represent the fair and considered judgment of the agency. In that case, Your Honor, the Supreme Court asked for the agency's views, solicited the brief. The brief came in signed by the acting Solicitor General of the United States and the acting Solicitor of Labor. And the court said, because presumably the opinion offered there wasn't a reversal of 70 years of history, that there's no reason to believe that this isn't the fair and considered judgment of the agency. And on that ground, Your Honor, they grant the deference. Now, compare that to the Koch situation. Koch said that when, that there's a pernicious risk, the risk of pernicious behavior by agencies using amicus briefs to smuggle new law in didn't happen in that case and the court granted deference to the brief. But what we've got here is precisely the concern that was identified in Koch. You have an agency that has for 70 years told an industry, told all industries for that matter, that the standard for the exemption is flexible, pragmatic, facts and circumstances driven, a multi-factor test, gone, poof, in an instant. It is now a bright line standard requiring the actual, irrevocable, personal consummation of a transfer of property for value. Now, this industry, as Your Honors have already noted, has been operating under a set of rules since 1940. And to answer Your Honor's earlier question, I believe it was you, Judge Smith, who asked about whether the agency could possibly have even known that the industry was operating this way, there's an opinion letter, 1945, involving detailed persons in which the question of their exempt status under the administrative exemption was addressed. It isn't mentioned in the briefs because the administrative exemption is not before the court in our case. But there's no claim, there can be no claim, that the department was simply ignorant of the pattern. What did it say? That they were exempt. They were exempt under the administrative exemption. So since 1945, the Department of Labor has known precisely how this industry operated. A quote, Your Honor, and it wasn't in the briefs, and I apologize, I know that this is not really cricket and an appellate argument to cite a case that wasn't in the briefs, but Judge Posner, in a Yee against Sterling Collision Centers case, 480F3-505, said that while it's possible for an entire industry to be in violation of the FLSA for a long time without the Department of Labor noticing, the more plausible hypothesis is that the industry's been left alone because what it's been doing has been consistent with the agency's view of the law. That's what we have here, Your Honor. We have an attempt to reverse seven decades of law in an amicus brief, an opaque process in which no one has any say. And I think that that's what's fundamentally unfair here. It's also inconsistent. It's also what drains the brief of any persuasive value under Skidmore because for the agency to have a persuasive view, the agency has to come to grips with what it said before.  Yes, Your Honor. There is some inconsistency here in the way that the extent to which the compensation of these folks depends on the amount of drug prescribed in their territory. And I'm just not understanding that the appellants say, well, they go out and there are pods and there are lots of people there so there's no correlation to the individual. And your side, I take it, has a different view. Could you just describe the relationship of the territorial volume to the efforts of these detailed people? I'm blessed in this case, Your Honor, because the factual record here is actually very clear and it's undisputed. Both plaintiffs, both Mr. Buchanan and Mr. Christopher testified in their deposition, and their documents, the documents that they authenticated at their depositions, clearly say their efforts led to greater volume from their doctors and they deserve to be rewarded in incentive compensation as a result. The nexus is drawn by the plaintiffs. It needn't be by the industry. I think that earlier Judge Tolman pointed out that, you know, why in the world would they be structuring their compensation this way if they didn't believe that there was the... Well, how many, does it reflect how many people there are running around in a specific... Is the territory the west side of Chicago? Is it the north side of Chicago? Typically, Your Honor... West L.A., what is it? Typically but not exclusively, and unfortunately it's a very complex industry, but typically, as I understand it, a PSR will have what they refer to as, this is my bag of drugs, these are the drugs that I'm assigned. There may be other GSK PSRs assigned to the same doctors in the same territories, but they're typically going to be trying to sell other drugs. Now, there's some reinforcing, and there are some situations in which individuals work in teams, but the sort of paradigm, the prototypical model would be multiple sales reps for each doctor or for each territory but for different drugs. Now, what GSK, and again, to introduce unnecessary or unhelpful complexity, the compensation scheme is tweaked every year, so the way that compensation is measured, incentive compensation is measured, varies year by year. But the goal is, recognized, designed by the company and recognized by the plaintiffs in this case, is to reward individual effort by the PSRs to obtain prescriptions for the drugs in their bag from the doctors they call on. And both plaintiffs were absolutely clear in their self-appraisals before the company. Me, I'm responsible. The volume went up in my territory, and the reason is because I'm really good at selling these drugs. So given the factual record in this case, it may not be in other cases, it may not be in every PSR case, given the factual record that we have in this case, there's a one-to-one correspondence, and the plaintiffs admit it. So I don't think that that's really an issue here. Can I ask another question? Yeah, sure. You had some talk about advertising. Yes. Now, the perplexing thing here is that the advertising that we see for drugs is aimed at the general public who can't prescribe them. So the notion is that the advertising is aimed at the patients who are then to go to their doctors to ask for the drug. Right. And then the sales folks are going in and telling the doctors they should prescribe these medications. The company is trying to reach demand from both sides. There's no question about that. In my view, there are a few very important phrases for your audience to remember. In some senses, the first one, I started with that. The next one is on sales. And I think this is where we find the line of demarcation between promotions work and sales work. Someone who's writing a display ad for a newspaper or producing a TV ad or handing out materials at a trade show, pure promotions work. Their job is accomplished if sales of GSK drugs go up. And if they go up in Sheboygan, that's good. If they go up in Miami, that's good too. We really don't care. We'd like to have them go up everywhere. They're indifferent. Buchanan and Christopher, Your Honor, didn't care whether the sales of GSK drugs went up in Portland, either Portland. They didn't care whether sales of drugs went up in Pasadena. What they cared was whether their drugs in their bag went up in their territory because they called on the doctors and induced them to write prescriptions because that's where they were compensated. That's what the incentive compensation scheme was designed to reward. That's the line of demarcation. In the regulations and in the cases that counsel for DOL referred to, what you had was a situation in which individual A, they used the phrase, paves the way. I come in and I tell them about all the new magazines we've got on offer and everything, but somebody else is coming in to close the deal. There's no one else closing the deal here. There's no one that is going to come in behind the PSR and generate the demand. Now, there are sales that occur between the company and the warehouse, the wholesaler and between the wholesaler and the drugstore, but that's inert product. It's going to sit there until demand is generated. In some sense, in nearly every sense, and in the sense that the Department of Labor has been talking about since 1940, the only person who sells is the PSR because that's how the demand for the drug is generated. Well, it's a combination of a lot of things. You've left out the physicians, the research docs, who are compensated by pharmaceutical companies to write favorable articles about how efficacious a particular product has proven to be in clinical trials. It's a complicated industry. There's no question about that. I'm sorry. Is there any comparable industry? Because the demand is generated, to be precise, by the prescriptions. I have looked, Your Honor. I don't know of any that actually fits this model. I think that it would be different if we were here talking about an industry that structured their sales force this way because that's the way it was convened or that's the way they wanted or they adopted this model because it met some business need. This was an armature, a structure that was imposed on the industry. And for 70 years, they've operated under this structure with the passive acceptance at a minimum, without any enforcement action from the Department of Labor, with the 1945 opinion letter on the administrative exemption, understanding that they were doing the right thing. Now, when you say that it was imposed on them, by whom? By the FDA. Yes. Yes, Your Honor. So I think that what you have here is a situation in which the industry has taken the guidance that they've received from the federal government, has done its best to implement it in a fair way. One of the things that may or may not be particularly relevant to your inquiry, Your Honor, is that in the Vargas case, there were over, gosh, I should have had the numbers at my fingertips. There were thousands of plaintiffs that had joined that suit, and less than 2% of them were current employees, incumbent employees, because the employees like the way that this is structured. You're talking about former employees who have brought these lawsuits. The industry adopted a model that works for the industry, that makes it consistent with the requirements of the Food and Drug Act and the Food and Drug Administration, and for 70 years has existed in a way that the Department of Labor has essentially blessed. I'm looking to see whether there are any other issues that Your Honor has raised during the earlier portions of the argument that I have not hit. Oh, one last point. Counselor for Plaintiffs just indicated that you should ignore 779-241, which is the regulation in which the Department of Labor says that you're selling as long as you're playing an essential role in the process of consummating a sale. Not consummating the sale, but playing an essential role in that process, which I don't think that there's any way you can look at this record and say that these people don't fit it. The Department of Labor didn't address it in their brief. They didn't address it in the brief in Novartis. Counsel for the Department of Labor didn't address it here this morning. Counsel for Plaintiffs says, ah, it's in the wrong part of the regs. Even though the title of that regulation is selling, and even though it talks about what it means to sell, you're entitled to ignore it, they say, because that's coverage. We're talking exemptions. There are two reasons why that can't work. First of all, the definition of the word sale is provided in one place, 203K, Section 3K of the Act, and it's preceded by a congressional demand that the definition given there be applied everywhere that word appears in the chapter. It doesn't say pick and choose, cramp construction here, expansive construction there. It's not insurance policy. Okay. I just have one quick question. What's the name of the case at 485 Third, the Posner case? Can I simply hand this up? Sure. That's fine with me. I'll share it. Thank you. All right. Are there any further questions? Any other questions? All right. Thank you. Thank you. Are there any further questions of the appellant of the Department of Labor? All right. Thank you. The case just argued is submitted for decision. All right. Okay. We'll hear the last case for argument, which is Lewis v. Verizon.
judges: Schroeder, Tallman, Smith M.